Exhibit A

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

*CASE NO.: 3:22-cv-1134*

MICHAEL LATELY AND CHRISTINE LATELY,

Plaintiffs,

vs.

SILACAL, INC., AND PATRICK FERRELL,

Defendants.

---

**A Report by Adam Grill**

**April 26, 2024**

---

Adam Grill
1236 Cordova St
Billings, MT 59101
(406) 248−2766

# I.  INTRODUCTION

I, Adam Grill, have been contacted by the law offices of Murray and Murray to review information and offer opinions regarding the case matter of <u>Lately, et al. vs. Silacal, et al.</u>, as a result of a crash that occurred at approximately 11:41 PM on June 27, 2020 on I-80 eastbound, at mile post 82, Licking County, Township of Harris, Ohio.

At approximately that time and location, Mr. Patrick Ferrell, in his commercial motor vehicle, had pulled over on the highway and re-entered the travel lane of I-80, moving all the way over to the left lane at approximately 15 miles per hour. Mr. Michael Lately was traveling eastbound on I-80 in the left lane approaching the area where Mr. Ferrell had moved into the left lane, and he collided with the rear of Mr. Ferrell's vehicle.

## A. Background[1]

1.  <u>Location</u>

   The event took place on I-80 eastbound, at mile post 82, Licking County, Township of Harris, Ohio.

2.  <u>Vehicle Status</u>

   a.  Unit 1: 2014 gray Chrysler 300, operated by Mr. Michael Lately.

   b.  Unit 2: 2015 gray Volvo 760 and a 2008 Stoughton Trailer,  operated by Silacal, and their driver, Mr. Patrick Ferrell.

---

[1] Information taken from the Ohio Department of Public Safety Traffic Crash Report, Local Report No: 90-0330-62; Local Information: P200062700002074.

3. <u>Police Diagram:</u>



a.

4. <u>Police Synopsis:</u>

a. "*Unit #1 and Unit #2 were both traveling eastbound on I-80. Unit #2 was established in the left lane after merging into the lanes of travel. Unit #1 approached and struck the trailer of Unit #2.*"

*Lately, et al. vs Silacal, et al.*
*Adam Grill / April 26, 2024*

## B. Scope

The purposes of this report are to present opinions in four overarching areas:

- General trucking industry customs, practices, and standards;

- The operating performance of Defendant Ferrell, the commercial motor vehicle operator in this case;

- The motor carrier management responsibilities of Silacal, the defendant motor carrier involved in this case; and

- Determinations of accident preventability from an industry standpoint.

1. Definitions for the purpose of this report:

   a. ACCIDENT AREA, means the same as crash area and refers to on I-80 eastbound, at mile post 82, Licking County, Township of Harris, Ohio;

   b. CDL, refers to a commercial driver license;

   c. CDL Manual, refers to the American Association of Motor Vehicle Administrators (AAMVA) Model Commercial Drivers' License Manual, and includes the CDL manuals from all states, including Ohio;

   d. CMV, unless specified otherwise, refers to a commercial motor vehicle;

   e. CMV OPERATOR, refers to the driver of a commercial motor vehicle like Defendant Ferrell;

   f. DRIVER, unless specifically described otherwise, refers to a CMV operator;

   g. FHWA, refers to Federal Highway Administration, from which Congress separated FMCSA in 1999;

   h. FMCSA, refers to the U.S. Department of Transportation's Federal Motor Carrier Safety Administration;

    i.   <u>FMCSR,</u> means Federal Motor Carrier Safety Regulations;[2] and

    j.   <u>SILACAL,</u> refers to Silacal, Inc., USDOT # 3034225, the defendant motor carrier in this case.

2.   This report presents specific information pertaining to:

    a.   Regulations and standard practices of professional drivers and motor carriers.

    b.   The responsibility of professional drivers to operate their vehicles in a safe and prudent manner, including (but not limited) by:

        i.   Making safe and reasonable decisions without impeding the reasonable flow of traffic or endangering other road users;

        ii.   Operating a CMV in a defensive manner with consideration for the rights and safety of others;

        iii.   Operating a vehicle in a watchful manner by keeping a lookout for hazards and the warnings and clues of hazards;

        iv.   Managing space;

        v.   Proper accident avoidance and mitigation.

    c.   The operating performance of Defendant Ferrell just before and at the time of the collision.

    d.   The motor carrier safety management responsibilities of Silacal as it relates to this case and Defendant Ferrell.

    e.   Industry standards for determining the preventability of accidents.

3.   Schedule of Appendices:

    a.   Appendix A – CV of Adam Grill.

    b.   Appendix B – Examination of material and information by Adam Grill in connection with the formation of opinions stated in this report.[3]

---

[2] The FMCSRs appear in Title 49 C.F.R., Chapter III, Subpart B.

[3] This material includes information and publications from readily available sources including the internet, The American Trucking Association, The Ohio CDL Manual, and the Federal Motor Carrier Safety Regulations.

## I.  Opinions based on experience, training, education and background

Raised in a family environment that centered on truck driving and truck driver training, I have worked around large commercial vehicles and studied the intricacies of commercial vehicle transportation among the best in the industry. I received my certification as a commercial vehicle operator in 2005. I hold a CDL with endorsements for hazardous materials, tankers, double trailers, triple trailers, passenger buses, and school buses. I am a certified director of safety (CDS). I am certified for forklift operation, operation of longer combination vehicles (LCVs), crane hoist and rigging, aerial manlift, telehandler, and heavy equipment including payloaders and motor graders. I am a certified pilot car operator and flagger through Gulf Coast Community College in Panama City, Florida.

For eight years I served in the US Army and US Army National Guard where I was called upon to teach truck and heavy vehicle operation and driver safety, among other duties. I am currently an active truck driver, and an associate of Atlantic Pacific Resource Group. I have formal truck driver training and education from Sage Technical Services, MTS Freight, the United States Army, the Montana Army National Guard, The National Safety Council, the Smith System Driver Improvement Institute, and others.

My family experience and lifestyle have always centered on the instruction and operation of heavy equipment and tractor-trailers. I currently serve as a trucking consultant and manage the fleet for Lew Grill Specialized Services. I have also assisted in over a dozen special studies and trucking projects covering safety procedures as well as time and motion studies including visibility from CMV drivers' point-of-view, starting/stopping, turning, and various other aspects of safe and efficient trucking operation. I have worked in various capacities as a teacher, including classroom instructor, off-road driving range instructor, and on-road skills instructor.

 I have over 15 years of combined experience as a truck driver, forklift operator, heavy equipment operator, industrial machinery operator, truck-driving instructor, dock supervisor, truck-driving consultant, and accident investigator. I am a member of the Transportation Research Board of the National Academies, Owner-Operator Independent Drivers Association, Truckload Carrier's Association, Montana Contractor's Association, National Private Truck Council, Montana Motor Carrier's Association, and the American Trucking Association. I have participated in educational training at the American Trucking Associations Technology and Maintenance Council. I worked on a project for the Federal Motor Carrier Safety Administration relating to the testing protocol for Electronic Logging Devices (ELDs) as required under the proposed rulemaking.

My current focuses include training and supervision of truck drivers, training instructors, and warehousing staff, fleet management for Lew Grill Specialized Services and The Legacy International Corporation, freight hauling and truck/trailer transportation, truck and driver dispatching, special projects for various fleet, industry, and government entities, and the development of educational programs for commercial drivers, equipment operators, and industry professionals, as well as supervisor for the motor carrier and broker relationships involving Atlantic Pacific Resource Group and The Legacy International Corporation with outside brokers, shippers, motor carriers, and others.

I have experience in truck accident investigation, vehicle dynamics, and accident reconstruction from the Legacy Corporation. I have testified in litigation matters where I have qualified as an expert concerning safe operation of commercial motor vehicles and the standard of care of commercial vehicle operators and motor carriers. I have operated a commercial motor vehicle for the furtherance of interstate commerce in AL, AZ, AR, CA, CO, CT, DC, DE, FL, GA, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY.

## II. TRUCKING INDUSTRY RULES, REGULATIONS, STANDARDS, CUSTOMS, AND PRACTICES.

### A. Standard customs and practices in the trucking industry.

The totality of trucking industry customs and practices is based upon the combined experiences of "stake holders" who are industry experts in their particular occupation, that share a common interest for highway safety. These are the type of resources relied upon within the industry which I, and similarly qualified experts, would use from day to day for purposes of safety and training. Included are truck drivers, owner-operators, motor carriers, risk managers, trade organizations, government, insurance companies, manufacturers, industry suppliers, and training providers and their instructors, to mention a few. All play an important role in the development of operating standards, training materials and their delivery to sensitize and educate CMV operators. This educational material includes, but is not limited to, publications and material produced by motor carrier industry sources, for example, the:

- American Trucking Associations (ATA);
- National Safety Council (NSC);
- The Smith System for Safe Driving;

- American Transportation Research Institute (ATRI) publications;
- State Trucking Associations;
- North American Transportation Research Institute (NATMI);
- Notice of Proposed Rulemaking for FMCSRs;
- American National Standards Institute (ANSI);
- Truckload Carrier Association (TCA);
- USDOT; and,
- Many others.

## B. The standard of care of truck drivers.

The standard of care for truck drivers is the same as for every road user, in the respect that the truck must be operated in a reasonably safe manner that avoids crashing into things, or having others collide with it. In my opinion, the performance standards to accomplish this standard of care are much different for truck drivers than for operators of smaller vehicles.

Their distinctive position as CMV operators is due to the very nature of their work, the additional training and licensing required, and the special characteristics of their vehicles, as described subsequently in this report. CMVs are the largest vehicles on the highway. Their height, size, and weight disparity compared to non-commercial vehicles creates a greater risk to the occupants of non-commercial vehicles when they are involved together in the same mishap.

## C. The need for CMV regulations and standards.

While all road users are subject to government regulations and driving standards, drivers and commercial motor carriers who operate large CMVs have more stringent requirements concerning their requirements for the reasonably safe operation of their vehicles. When it comes to highway safety, these more stringent requirements apply because of the very nature of their work, and the special characteristics of their vehicles. These characteristics require additional care in driver selection, training, management, and supervision to ensure safe operations are achieved and maintained. The need is often set forth in a notice of proposed rulemaking by the various governmental agencies involved in regulating the industry.

**D. CMVs require a higher degree of safe driving performances.**

All CMVs are more complicated and less stable than non-CMVs, making them more difficult to operate. In comparison to non-commercial vehicles, their design characteristics, control instruments, and mechanical systems require special knowledge, skills, and driving behaviors in order to drive them safely, legally, and efficiently. A partial list of differences includes that large trucks:

1. Are bigger and heavier than other vehicles;

2. Are more difficult to maneuver;

3. Are more complex to drive;

4. Must be inspected more frequently;

5. Take longer to accelerate and to stop;

6. Have complex vehicle systems and more individual components;

7. Entail special knowledge and skills to operate and maintain;

8. Require a special driver's license, certification, and qualification;

9. Have more and different regulations to obey;

10. Require more alertness and caution, and greater driver performance duties in order to achieve the same standard of care as other road users;

11. Have different energy absorbing systems that are often mismatched with smaller vehicles; and,

12. Have significant mass/weight differences.

Motor carriers and drivers who operate CMVs are required to know and obey a much broader and more stringent series of state and federal regulations than those who operate non-commercial vehicles. CMV operators operate enormously more hours and more miles than non-CMV drivers do. It is common for CMV drivers to spend ten times the amount of time behind-the-wheel than other drivers. Therefore, they and their equipment must be prepared to safely handle a much greater number of hazards and stressful situations.

## E. Federal Motor Carrier Safety Regulations (FMCSR).

The FMCSRs are applicable to all employers, employees, and commercial motor vehicles, which transport property or passengers in interstate commerce. Motor carriers, including officers, agents, representatives, employees, and drivers, or those who are responsible for hiring, assigning, training, supervising, maintaining, dispatching, or driving trucks, have a statutory responsibility to be instructed in, and comply with Federal Motor Carrier Safety Regulations.[4] Moreover, the federal regulations require that all drivers of commercial motor vehicles shall have knowledge and skills necessary to operate a commercial motor vehicle safely.[5]

## F. USDOT/FHWA Minimum Performance Standards for Truck Drivers.

The Truck Driver Model Curriculum, as it is known in the industry, is a broad set of standardized minimum core curriculum guidelines and training materials. In the 1980's, the U.S. Department of Transportation's, Federal Highway Administration (FHWA) determined that a need existed to propose minimum training standards for tractor-trailer drivers. To provide technical guidance, the FHWA developed a model curriculum that could be used for training them. The curriculum incorporated the FMCSR and addressed the critical aspects of truck driver performance standards. It identifies the specific knowledge, skills, and attitudes necessary for truck drivers to perform their work in a safe, legal, and efficient manner.[6]

## G. Commercial Driver's License Standards.

Established under the Commercial Motor Vehicle Safety Act of 1986 (CMVSA), the CDL requirements are intended to improve highway safety by requiring commercial vehicle drivers to pass a series of knowledge and skills tests that are directly related to the special handling characteristics for the type of vehicles they drive. To that end, the CMVSA directed the FHWA[7] to develop national minimum licensing standards, which all CMV drivers must meet in order to obtain a CDL. The existing USDOT/FHWA Model Curriculum was used to develop the CDL written and driving skills tests that were implemented as licensing standards in 1992 and remain as the commercial drivers' licensing standards in use today.

---

[4] FMCSR § 392.1.
[5] FMCSR § 383.3. See also §§ 383.110, 383.111, and Appendix to Subpart G – sample guidelines for required knowledge and skills.
[6] Model Curriculum: Minimum Standards for Training Tractor-Trailer Drivers, USDOT/FHWA, 1985, GPO Stock No. 050–001–00293–1.
[7] Congress created FMCSA as separate from FHWA in 1999 to assume these responsibilities.

1. "*All drivers of commercial motor vehicles shall have knowledge and skills necessary to operate a commercial motor vehicle safely*"[8] as contained in the FMCSRs. To that end all states publish CDL manuals for commercial driver license applicants in their states. These requirements "*apply to every person who operates a commercial motor vehicle (CMV) in interstate, foreign, or intrastate commerce, to all employers of such persons, and to all States.*"[9]

2. It is for this reason that the CDL manual in every state is substantively uniform to those published by all other states, and it contains the general knowledge, and describes the required knowledge and skills for truck drivers.

3. The CDL Manual contains the information that truck drivers should know and consider when operating a CMV, including the requirements concerning managing speed and space, keeping a proper lookout, and accident avoidance and mitigation – to name a few.

## H. Defensive Driving Standards.

As identified previously in this report, all commercial motor vehicles require a higher degree of driving performance in order to operate reasonably and safely. Simply put, what is reasonable for the properly qualified and trained CMV driver is substantially different from what is reasonable for the non-CMV licensed driver of a regular passenger car, truck, or SUV. Many defensive driver programs have become widely accepted and well-known educational resources for motor carriers to train, educate, and evaluate commercial drivers. It is paramount that motor carriers take advantage of these defensive driving standards. Some of the defensive driving program sources include the National Safety Council (NSC), The Smith System Driver Improvement Institute of America, and J.J. Keller to name a few.

## I. Strategy of Safe Driving.

The strategy of safe driving is achieved through the development and improvement of five mental driving skills: searching, identifying, predicting, deciding, and executing.[10]

   a. Searching the driving environment.

   b. Identifying the hazardous driving condition or situation.

   c. Predicting the probable sequence of the hazard.

---

[8] FMCSR § 383.3 Applicability, and §§ 383.110, 383.111, and Appendix to Subpart G— sample guidelines for required knowledge and skills.

[9] Id. at § 383.3.

[10] This driver perception process is commonly abbreviated as SIPDE and is a recognized defensive driving process similar to the Smith System 5 Keys and the information promulgated throughout the state CDL manuals.

d.   Deciding on what maneuver is required to avoid the hazard.

e.   Executing the required maneuver.

## J. Gatekeepers to highway safety.

1.   Motor carriers who allow drivers to operate commercial trucks have specific requirements and Safety Management Controls required by the FMCSRs and industry standards, including:

   a.   Driver qualifications;

   b.   Vehicle inspection and maintenance procedures and records;

   c.   Driver compliance with controlled substances and alcohol testing;

   d.   Driver compliance with driver hours of service, including company and driver's ability to plan trips to conform with speed limits and regulations;

   e.   The company's compliance with federal, state, county, and local regulations utilizing the Safety Management Cycle that complies with the recommendations of the FMCSA for reasonably safe motor carriers.

2.   Motor carriers, like Silacal and their drivers who operate CMVs are required to know and obey a much broader and more stringent series of rules and regulations. The increased exposure of risk and danger to the environment and general public increases their responsibilities and performance duties to maintain that same standard of care proportionate to the risks involved.

3.   Because of the complex variables associated with their driving environment, their equipment, and the amount of time spent on the highway, recklessness, or carelessness of a CMV operator is likely to result in a catastrophic crash or event. Therefore, it is critical that CMV operators like Defendant Ferrell have advanced knowledge and skill, safe driving attitudes, are physically and medically fit, are alert to safely do their work proportionate to the greater degree of risk they are exposed to and can fulfill the higher degree of safety performance required of them as professional truck drivers. These higher performance standards are essential to highway safety and can only be derived from proper driver selection, supervision, regulatory obedience, driver monitoring, driver training, and experience.

4.   The roles of persons who hire, manage, supervise, train, and retain drivers, as well as the role of those responsible for assigning loads for CMV drivers to transport, are paramount to highway safety. Moments before a crash is not the time to learn required knowledge, skills, and attitudes, nor is it the time to discover that a driver may not be physically or medically fit or lacks the necessary

experience and/or training to operate a CMV safely. The important role of motor carrier management, and strict compliance to motor carrier rules, regulations, customs, and practices related to the safe operation of CMVs, cannot be overstated.

## III. OPINIONS REGARDING THE MOTOR CARRIER MANAGEMENT RESPONSIBILITIES OF SILACAL.

### A. Silacal had a regulatory responsibility to ensure that their drivers, like Defendant Ferrell, met their obligations under the Federal Motor Carrier Safety Regulations.

1. FMCSR §390.3 – General applicability.

   a. "*(e) Knowledge of and compliance with the regulations. (1) Every employer shall be knowledgeable of and comply with all regulations contained in this subchapter that are applicable to that motor carrier's operations. (2) Every driver and employee involved in motor carrier operations shall be instructed regarding, and shall comply with, all applicable regulations contained in this subchapter.*"

2. FMCSR §390.11 – Motor carrier to require observance of driver regulations.

   a. "*Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*"

3. Motor Carriers are "*liable for the actions of their employees even though the carrier contends that it did not require or permit the violations to occur ... Liability under the FMCSRs does not depend upon actual knowledge of the violations ... Neither intent to commit, nor actual knowledge of a violation is a necessary element of that liability.*" Motor carriers "*permit*" violations of the regulations by their employees "*... if they fail to have in place management systems that effectively prevent such violations.*"[11]

---

[11] FMCSR Interpretations to §395.3, Questions/Guidance 7 & 8.

    4. FMCSR §392.2 – Applicable operating rules.

        a. "*Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated. However, if a regulation of the Federal Motor Carrier Safety Administration imposes a higher standard of care than that law, ordinance or regulation, the Federal Motor Carrier Safety Administration regulation must be complied with.*"

**B. Silacal had a responsibility to deploy successful safety management systems that would effectively train their drivers in the safe driving concepts identified subsequently in this report.**

1. "*Safety must be considered as an essential element in the operation of every motor fleet, regardless of size, type, or function. … Motor fleets that do not have effective safety or loss prevention programs place themselves in positions of financial jeopardy, regulatory crisis, and social irresponsibility.*"[12]

2. Supervisors, managers, and persons within a company that are responsible for protecting the company's assets and investments, including profit play a key role in the function of highway safety.

    a. "*Safety programs should be considered on another basis – as a social necessity of a motor fleet. In addition to showing concern for the well-being of its employees, the socially conscious motor fleet industry recognizes that it has moral and social responsibilities toward the public with whom it engages on a regular basis.*"[13]

3. According to the ATRI Studies on Predicting Truck Crash Involvement:

    a. "*Each of the carriers emphasized during the interview process that proactive safety measures, such as initial and "sustainment" training, are the lynchpins to ensuring that negative safety incidents do not occur in the first place. The value of these safety programs, however, must be complemented by remedial safety training programs that mitigate a problem driver behavior after a negative safety incident has occurred.*"[14]

---

[12] North American Transportation Management Institute. "Safety, A Management Function." Motor Fleet Safety Supervision: Principles and Practices, Eighth Edition, Denver, CO, NATMI, 2019, p. 1. (NATMI is a professional development organization for transportation industry professionals. NATMI offers professional training courses throughout North America for truck, bus, and transit fleet professionals in the areas of fleet safety, fleet maintenance management, transportation security, and accident investigation.)

[13] North American Transportation Management Institute. "Safety, A Management Function." Motor Fleet Safety Supervision: Principles and Practices, Eighth Edition, Denver, CO, NATMI, 2019, p. 1.

[14] Predicting Truck Crash Involvement, 2011 Update, page 24.

b. *"All of the safety directors emphasized the need to keep safety "constantly in front of the drivers." To do that, all of the carriers had a continuous "sustainment" training program. These programs blended standard safety training activities with company-specific strategies (that were derived from company safety data such as crash and conviction types)."*[15]

   (1) **OPINION:** In order to have a successful sustainment training program, a motor carrier must take a three-phase approach to the training: 1) Educate drivers on a subject; 2) Show drivers what the company's expectations are through practical hands-on experiences; and 3) Assess or test drivers to ensure that they meet, and believe in, the qualifications and standards you've set forth.

c. *"The carriers interviewed routinely performed employee performance reviews at regularly scheduled intervals, almost always more frequently than the federally required annual driver motor vehicle record (MVR) review. Several of the carriers reported using these reports to look for potential trends or patterns of behavior in order to effectively monitor and, if necessary, take corrective measures to improve the driver's safety performance."*[16]

d. *"Similarly, the Crash Predictor serves as a resource for motor carriers, providing critical guidance on targeted risk-reduction training for incoming drivers, as well as targeted remedial training opportunities for veteran drivers."*[17]

4. There is a direct correlation between the necessary culture of a company and one that supports safety. According to the CTBSSP Synthesis 14: The Role of Safety Culture in Preventing Commercial Motor Vehicle Crashes:[18]

a. *"… Organizational culture is generally defined as the norms, attitudes, values, and beliefs held by members of an organization."*

b. *"The term 'safety' describes a condition where adverse events and hazards are avoided, and barriers are erected to prevent future occurrences or interactions with such events or hazards. In the workplace, safety can describe the act of avoiding being the victim of or the cause of 'accidents'."*

---

[15] Id., page 25.
[16] Id.
[17] Id., 2018 Update, page 40.
[18] Commercial Truck And Bus Safety Synthesis Program, (CTBSSP Synthesis 14), The Role of Safety Culture in Preventing Commercial Motor Vehicle Crashes. By the Transportation Research Board, 2007.

c.   "*The INSAG-4 report defines safety culture as: That assembly of characteristics and attitudes in organizations and individuals which establishes that, as an overriding priority, … safety issues receive the attention warranted by their significance. (INSAG 1991).*"

d.   "*Safety managers interviewed stated that safety is: Something that is 'lived' or is a way of life. It is part of the way people think. It is not something superficial. It is led by the drivers' method of safety application; the tone of these safety applications is set by management; it is a combination of leadership and training that creates a safety value among employees.*"

5.   Deposition Testimony of Mr. Krzysztof Karleszko, Owner/President of Silacal 30b6 Deposition.

a.   Page 7: "***Q:***  *Okay. And what was your role at Silacal?* ***A:*** *I was the owner of it, so I was the president.* ***Q:*** *Did you wear any other hats in that role?* ***A:*** *I did. I had to wear all the hats. We were a small company.* ***Q:*** *Okay. So were you also a safety director?* ***A:*** *We didn't have a safety director. I did work on safety, yes.*"

b.   Page 43: "***Q:***  *Would the drivers have received copies of any safety policy procedures or their training policies when they started with the company?* ***A:*** *They did receive something from – from – like a little book from Silical, the general policies. And they've also been trained by the safety company before they would come in, but I don't think I have a copy of that.* ***Q:*** *You don't think you have a copy of the Master Safety one, is that what you mean?* ***A:*** *Yeah. I think that was more verbal.*"

c.   Pages 52-53: "***Q:***  *Did you ever conduct the road tests – well, let me strike that. Was there anybody in particular within Silical that was assigned to do road tests in 2018?* ***A:*** *If it would be somebody, that would be me. I don't remember right – if I had one with Patrick or not. I don't remember that.*"

d.   Pages 72-73: "***Q:***  *Okay. This indicates in 2007 you'd have safety meetings. Is that something that Silical would do, safety meetings, or would it be Safety – like you have a Master Safety that would do those?* ***A:*** *We would have some safety meetings for drivers, you know, either individually – most likely individually, and Master Safety did their own, you know, usually at the beginning.* ***Q:*** *Okay. Do you recall who would lead any driver safety meetings that you had?* ***A:*** *I usually had a – you know, drivers were over the road so, you know, I would speak to them directly.*"

e.  Pages 86-88: "***Q:***  *Okay. This is – the citation here was because you had a driver who didn't have a CDL. Do you recall that being a problem in 2021?* **A:** *What was the name of the driver?* **Q:** *Well, they don't provide that information as part of a public records request, so I don't know that.* **A:** *Well, I definitely would not put a driver with no CDL in a truck, so I don't remember what that is.* **Q:** *Okay. Well, this – there was also a citation, it says there were 18 for driving past the fourteenth hour that was permitted. Does that sound – does that refresh your recollection of the company having an investigation by the Department of Transportation?* **A:** *I remember there was something going on like that, you know, I just don't remember dates.* **Q:** *Okay. And then it also had 20 citations for driving past – driving more than 11 hours. You see that too, correct?* **A:** *I do see that, yes.* **Q:** *So you don't dispute any of this information from the DOT, correct? ... **A:** I don't dispute it. I don't understand what you're saying.* **Q:** *Okay. Well, so this was part of a public record on Silacal.* **A:** *That is correct.* **Q:** *The question to you is, have you seen these, this investigation report before? ... **A:** I'm not sure. But, you know, those are – from what I see, those are reports of the officer. But, you know, sometimes, you know, the driver would have, you know, their logbook, let's say, you know, disabled, not working, and they would get cited for this, like this. And then they would show that they're doing – that they were over their 11 hours. There's – I don't exactly know what this is, but there's, you know, different explanations of how this can happen. Driver can make a mistake on one – on one day of logbook, and then for every day after he's going to get cited for.*"

f.  Page 89: "***Q:***  *In Exhibit 52, in 2021 – so we were just looking at a report of an inspection that occurred on 5/14/2021. On 5/17/2021 your company received a conditional rating. Do you have any recollection as a company of receiving this letter?* **A:** *I don't remember this letter, but I remember having this outcome.* **Q:** *Okay. Do you remember what led to this outcome?* **A:** *There was something, you know – I had some drivers that had some inspections, I believe. There was some issues with those logs, the logging devices, and they determined to put us in a conditional, yes.*"

g.  Page 93: "***Q:*** *So we're in December. And so when we get to June – so let's go to the beginning of this year, the year the crash occurs. So in the end of January of 2020, your unsafe driving line, as regulated by the DOT, is at 74 percent and you're given an alert. You're in the 99th percentile, which doesn't – it doesn't really sound the way it is because there's an alert with it. So your hours-of-service compliance are very low, and the vehicle maintenance was also under alert. Now, does this sound familiar to you?* **A:**  *I did not see that document.*"

h. Pages 95-96: "***Q:*** *As a – are you surprised as the company representative that the DOT was marking your – Silical as being – having an alert in unsafe driving and in hours-of-service compliance in the time period leading up to this crash? Is that knowledge that you otherwise have as an entity?* ***A:*** *Okay. I wasn't – I didn't know about this exactly. But, you know, I know, as I mentioned before, we had some problems with the electronic devices and that would lead to some of the violations, so I guess I knew that there was, you know, some issues going on. And with the low amount of trucks, even a couple of inspections would lead to probably those alerts are showing up as – you know, you have a huge – when you have a huge fleet of trucks then everything averages out a little bit better, you know.* ***Q:*** *Okay. And just for the record, on June 26th of 2020, we still have the same unsafe driving and hours of service. This is the 26th, so very close in time to the crash, and you see that, correct?* ***A:*** *I can see that.*"

6. Deposition Testimony of Mr. Krzysztof Karleszko, Individually.

a. Page 20: "***Q:*** *And what kind of problems did you have with your ELDs?* ***A:*** *No connectivity to the ECM, the computer of the truck. The drivers would complain that the device is not recording their drive time. They're being left with just a blank line. And then it would be a problem because if you get pulled over like that with the periods even like that, you get violated for it.*"

b. Pages 30-31: "***Q:*** *Okay. You can see up here, in October it talks about the out of service rates for vehicles, so yours is lower for vehicles, but for drivers it says 21 percent versus 5.5 percent. Do you see that?* ***A:*** *I do. ...* ***Q:*** *Yes. Would you agree that you had – according to the Department of Transportation, you had more problems with drivers than you did with your vehicles? ...* ***A:*** *No, I don't believe so. I have a different theory on -- in this one, if you want to hear it.* ***Q:*** *Yes.* ***A:*** *So now our vehicles goes through the east part of the country where there's not that many scales. Most of the vehicles, when you see that average of out of service drivers and vehicles, are for the vehicles that travel when there's a lot of scales. Like, for example, you go to California you have to pass six or seven scales, and very likely is that you get pulled over and they give out good inspections over there. On the East Coast they only pull you over when they see something wrong because there's no scales in place. So that average will be higher, unfortunately, due to the geographic area of where we traveled.* ***Q:*** *Which would be the higher, the vehicles?* ***A:*** *No. Drivers' vehicles – I mean, it – it is higher due to the areas that we traveled.* ***Q:*** *Because you're saying it's higher on the – traveling to the west because they have scales and you did a lot of driving to the west?* ***A:*** *I don't go to the west. I go to the east. I used to go to the east.* ***Q:*** *Okay.* ***A:*** *So there's no scales. The way it works in transportation is you pull through the*

*scales and they look at you and they, 'Okay, come inside for a level three inspection,' for example, right? And all they do is check paperwork. Paperwork, they say okay, you haven't passed inspection, your average is going down. Versus when you go to the East Coast there is no scales in place, so the police officers are only pulling over people when they already see there's a problem. That's why you see this average a little bit higher. **Q:** I see. I understand your theory. **A:** And it's not a theory, it's a fact, so... I know it. Because none of those inspections that I had was random, I mean random from the standpoint of that I'm just going to inspect you, just inspect you. Most of them they're directed because there was an issue. **Q:** Because they already saw that the driver was doing something they found to be in violation of a regulation, correct? **A:** That's correct.*"

c.  Pages 34-36: "***Q:*** *Okay. Okay. So like here, at this point in time you had three violations – three violations, the severity is 7 under this driving 11 to 14 miles an hour over the speed limit. ... **A:** You're just reading, so continue reading. Yes. **Q:** Yes. So you see that there, correct? **A:** I can see that. **Q:** And you understand that the, when you pull an SMS report it covers the two-year period from the date that you pull it to the two years look back, right? **A:** Okay. **Q:** So you can see that in that time period you had three times where somebody was pulled over from Silical because they were driving 11 to 14 miles an hour over the speed limit, correct? **A:** I don't understand what you're saying. Three times what? **Q:** You see the three here, the three for the number of violations, correct? **A:** Okay. **Q:** Is that a yes or a no? **A:** I think your interpretation of this is incorrect but go ahead. **Q:** Okay. Sir, so here it says – again, this is 3 for driving 6 to 10 miles an hour, and then there's another one under a different regulation, but also for driving over the speed. So what is your interpretation of what these cita – these violations mean? ... **A:** I mean, they're violations, right? They're listed violations over here. **Q:** Okay. **A:** I don't understand what your question is about interpretation. **Q:** I just asked you, do you see where there are violations three times for some drivers driving 11 to 14 miles an hour over the speed limit, and you responded, "I don't agree with your interpretation." So I'm asking you – **A:** I don't think that's what it means, but, you know. **Q:** What do you think that means? **A:** I think that it means severity over weight of that. There's some – I don't remember exactly right now, but there's some formula to allow this. There's either 1, 2 or 3, but I could be wrong. But this – that's beside the point. I don't – let's move over because I don't see the relevance over here. **Q:** Sir, it says here the severity is in this third column, you see that, correct? **A:** Yes. **Q:** Okay. So that's severity. This is the number of violations. And you don't disagree, do you, with the statement that during this time period there are seven violations for which a driver gets pulled over for driving*

*over the speed limit, correct? **A:** I don't see that from this, what you're looking at, but if that's your assumption, then that's what it is.*"

d.  Pages 48-51: "***Q:*** *Okay. And you never had a conversation with Mr. Ferrell about the rest area immediately before it and why he didn't stop there, correct? **A:** I don't recall. **Q:** Is there anything that would refresh your memory about any conversations you had with Mr. Ferrell regarding the events leading up to this crash? **A:** No, I don't think so. No, those are verbal conversations. You know, it was pretty emotional as well, you know. It was a very serious accident, you know. I was worried about, you know, everybody's safety at that point, you know. **Q:** If there is a problem with a rest area regularly having under capacity for truck drivers, you would agree that's part of the drivers' route planning responsibility to prepare for that, correct? ... **A:** No. I believe this is, you know, State's responsibility to widen them and make more room for drivers that need to stop at appropriate time and take care of their business, sleep, and so forth. We pay our taxes and the State should make sure that we have enough infrastructure. **Q:** When you did an evaluation of the cause of this crash, did you have any evidence that Mr. Ferrell attempted to even stop at that rest area? ... **Q:** The rest area that was four miles before this crash. ... **A:** I don't recall. **Q:** That would have been important to understanding whether or not Mr. Ferrell, in fact, had an emergency, would it not? **A:** It's kind of a, you know, a weird subject to talk about, you know. I would imagine that's embarrassing to admit that you had to pull over to pee, you know. But, you know, I don't measure myself as my own because I'm young and healthy and, you know, people get different conditions throughout their lives, so, you know, I don't know how, you know, everybody's situation is, you know. I imagine that if he's telling me that he had an emergency to pull over, that's what it was. **Q:** So you took him on his word that that's what was the issue, correct? **A:** I mean, that's the only thing I could do. **Q:** Well, you could have investigated as to what his other options were and whether he tried anything else, correct? ... **A:** It's incorrect. I cannot turn back time and go to those rest areas and see how packed they were and if it was safe to go in to them, so... **Q:** You could see on the tractor's speed as to whether or not he attempted to stop at that rest area that you're suggesting may have been too full in spite of your taxes paying to have enough spots? You could have seen that from his tractor speed, correct? ... **A:** No, I could not.*"

   e.  Page 58: "***Q:*** *And this is a letter from the FMCSR. This is about a year and a half before the crash, February 8th of 2019. Can you see that document?* **A:** *Yes.* **Q:** *Okay. And this, at this point, notes that you have significant noncompliance in the area of unsafe driving. This letter was sent to your personal address, correct?* **A:** *That's what it looks like.* **Q:** *And as part of this letter they tell to you where to go to see – to review everything. Do you recall receiving this letter and doing anything in regards to this, as a response to what you were being notified of?* **A:** *Okay.* **Q:** *Do you recall receiving the letter?* **A:** *No. That was a long time ago. I don't remember if I did. If you're asking me if I did receive it, I'm sure I did.* **Q:** *Okay.* **A:** *I just don't remember.*"

## IV. OPINIONS REGARDING THE CMV OPERATING PERFORMANCE OF DEFENDANT FERRELL.

   **A.  Defendant Ferrell knew, or should have known, all of the information in the CDL Manual that is expected of any well-trained, prudent, safe, defensive CMV operator. Including:**

1.  FMCSR § 383.111 – Required Knowledge.

   a.  "*(a) All CMV operators must have knowledge of the following 20 general areas: **(1) Safe operations regulations.** Driver-related elements of the regulations contained in parts 391, 392, 393, 395, 396 and 397 of this subchapter, such as: ... (ii) Procedures for safe vehicle operations; ... **(7) Visual search.** The importance of proper visual search, and proper visual search methods, including: (i) Seeing ahead and to the sides; ... **(10) Space management.** The procedures and techniques for controlling the space around the vehicle, including: (i) The importance of space management; (ii) Space cushions, e.g., controlling space ahead/to the rear; ... **(13) Hazard perceptions**. The basic information on hazard perception and clues for recognition of hazards, including: (i) Road characteristics; and (ii) Road user activities. ...*"

      (1)  **OPINION:** This required knowledge, which Defendant Ferrell knew or should have known, means that Defendant Ferrell has different and unique performance objectives when operating a CMV, including greater anticipation than operators of non-CMVs to avoid becoming involved in a collision.

      (2)  **OPINION:** This required knowledge is also outlined and explained in the CDL Manual. Further, the information in the CDL Manual is substantively similar to the safety concepts taught in the Smith System's 5 Keys to Safe Driving as well as other industry resources as cited throughout this report.

*Lately, et al. vs Silacal, et al.*
*Adam Grill / April 26, 2024*

**B.  Defendant Ferrell had a responsibility to apply industry defensive driving concepts like The Smith System.**

1.  The Smith System includes the following five critical keys:

    a.  Aim High In Steering.

        (1)  Look far ahead into the area you're approaching;

        (2)  Extend your forward visibility according to your speed, using at least a 15 second eye lead time.

    b.  Get The Big Picture.

        (1)  Maintain a 360-degree circle of constant awareness;

        (2)  Position yourself so that you can see all around you;

        (3)  Prioritize what areas around you will require more attention;

        (4)  Getting the big picture allows you to anticipate the actions of others, and helps you allow for relevant traffic variables.

    c.  Keep Your Eyes Moving.

        (1)  Keep your eyes moving in order to continuously get the big picture;

        (2)  Scanning skills become much more important when there is traffic, pedestrians, potential hazards, or difficult maneuvers.

    d.  Leave Yourself An Out.

        (1)  Leave space around your vehicle for increased visibility and a way out of trouble;

        (2)  Constantly evaluate your traffic position;

        (3)  A space cushion gives you an escape route and reduces your vulnerability to the actions of other drivers.

    e.  Make Sure They See You.

        (1)  Get eye contact;

        (2)  Communicate early so that if others don't heed than you have time to give yourself an out.

2.  According to The Smith System, following these five keys accomplishes three objectives:

    a.  Creates space for the vehicle – Allows the driver to be less vulnerable to driving errors from others or from oneself.

    b.  Gains Visibility for the driver – Allows the driver to gather crucial traffic information in order to make safe, reasonable, and prudent driving decisions.

    c.  Provides time to make decisions – Allows the driver to think, react, and retain space around the vehicle.

*Lately, et al. vs Silacal, et al.*
*Adam Grill / April 26, 2024*

**C. Defendant Ferrell intentionally took away space for other road users, essentially becoming a "sitting duck" for any person approaching behind him.**

1. It is a well-known and commonly held belief that parking or moving unexpectedly slow on the shoulder of the road or worse, in the traveled portion of the road, is a dangerous and extreme deviation from the standards of care expected of well-trained, experienced, safe, prudent, reasonable CMV operators. At low speeds, it becomes a type of rolling roadblock for the vehicles approaching from behind by traveling at a much slower speed than the highway traffic. Examples of this commonly held belief in the industry are extensive, examples follow.



a.



> **"Don't be a Sitting Duck"**
> **Definition:** Vehicle parked along the side of any roadway.
> **Reason:**
> • Vehicle breakdown
> • Driver sleeping
> • Driver reading map
> • Driver answering call of nature
> • Driver updating log book
> **Result:** Major collisions involving fatalities and enormous costs.

b.

c. See Appendix D, Swift Company Driver Operational Handbook, where it says, "*Stops at roadside should be of an emergency nature only. Never stop at the roadside unless there is no other alternative. Many accidents are caused by vehicles being parked at the roadside. In many states it is illegal. … Many times, in the darkness, drivers will rear end stopped vehicles not knowing they are stopped. If a rear end collision happens, it is about 90% your fault for just being there.*"

d. See Appendix E, SALT Institute, Inc., Course 101A, Issued 12/13/96, where it says, "*Never ever park or stop on the side (emergency lane/shoulder) of a high-speed roadway when you physically 'can get off' the high-speed roadway and stop. 'emergency lanes' are exactly what the word implies – for emergency use only – and that means when you really can't move your vehicular unit(s).*"

e. See also where it says, "*THE FIRST RULE IS!! Never stop on the emergency lane or shoulder of any high-speed freeways, interstates, or two-lane <u>roads unless you simply can't move!</u>*"

f. See also where it says, "*Ever since we have been recording accident data, rear end accidents have been one of the 'highest frequency' type of accidents. Secondly, for at least 25 years we, in the accident business, have known that 'normal drivers guide on lights in front of them at night'. We have also known that drivers guide on the vehicles in front of them during daylight, which is known as 'follow the leader accidents.' Now, the moth phenomena accident (bug to the light) is really a trap and one a professional driver must be aware of from both ends!! That is to say, if you stop on any high-speed roadway your probability of accident increases and at night it grossly increases because people (and you) guide on lights – yours or theirs – taillights or emergency flashers. This is 'why' triangles are required if you are stopped … If you are compelled to stop on the side of a roadway, remember to immediately and correctly place your triangles in accordance with the road you find yourself on.*"

g.  See the Virginia Transportation Research Council's report, <u>Passenger Vehicle Crashes Into Stationary Large Trucks: Incidence and Possible Countermeasures</u>, where it says, "*As to possible countermeasures, two approaches stand out: increasing driver attention and <u>removing large trucks from the shoulder.</u>*"

h.  See Appendix F, Underride Network "Current Issues" article, where it says, "*Trucks should never be parked on high-speed roadways (above 25 mph or 40 km/h) unless disabled, studies have shown the severity of crashes increase from non-fatal to fatal at 25 mph (40 km/h) and above with the current stiff underride guards on U.S. trucks. Roadway parking should always be your choice of last resort!*

i.  See Appendix G, Tower Group Companies' report, where it says, "*Parking on highway shoulders and on the side of the other roadways in non-emergency situations is prohibited in most states and local jurisdictions – for good reason. Vehicles parked on shoulders and similar areas significantly contribute to accidents resulting in injury and even death, and they're often preventable.*"

j.  Lastly:



(1)

(2) **OPINION:** Defendant Ferrel did not have an emergency where he could not safely move his vehicle off of the highway. Mr. Ferrel stated to the police after the accident that he had pulled off on the shoulder between the construction zone barrels, "*because it was safer/I had to pee*" and had just pulled back out into the roadway when the accident occurred. Defendant Ferrell stated he was traveling "*not even 15 miles per hour*" in the left lane of a 50-mile-an-hour roadway.[19] When Defendant Ferrell pulled out onto the roadway, he saw the headlights of Mr. Lately's car, yet he pulled back out into traffic as a rolling roadblock for traffic approaching him from behind. Defendant Ferrell had just passed the Wyandot Service Plaza at approximately Mile Post 77 where he could have safely removed his vehicle from the roadway and gone to the restroom and not risked blocking the roadway for approaching traffic by traveling at 15 miles per hour on a 50 mile per hour roadway.

## VI.  OPINIONS REGARDING THE DETERMINATION OF PREVENTABILITY FROM A COMMERCIAL TRUCKING INDUSTRY STANDPOINT.

### A.  The below standards and definitions are used in performing a preventability analysis in the trucking industry.

1.  American Trucking Associations' Guidelines for Determining Preventability of Accidents.

   a.  "*The concept of preventability is based on the premise that a professional driver is expected to meet a higher standard of performance than the average motorist. It is self-evident that the professional driver should be able to observe and assess the behavior of pedestrians and other drivers and recognize those actions which may create hazardous conditions and take every reasonable measure to avoid involvement in an accident.*"[20]

2.  The ATA's Guidelines also mention that an accident is generally preventable if:[21]

   a.  Driver was inattentive or failed to accurately observe existing conditions;

   b.  Driver's speed was not consistent with existing road, weather, and traffic conditions;

---

[19] See the Ohio Department of Public Safety Traffic Crash Report, Local Report No.: 90-0330-62, page 12.
[20] ATA Preventability Guide, page 11.
[21] Id., at page 14.

    c.   Driver's speed precluded stopping within available clear distances;

    d.   Driver misjudged available clearances (above, below, or on the sides) resulting in the striking of a fixed object;

    e.   Driver was not entirely in the proper lane of travel;

    f.   Driver failed to control vehicle;

    g.   Driver failed to yield right-of-way to avoid an accident;

    h.   Driver failed to communicate their presence or intended actions through appropriate means; or,

    i.   Driver was in violation of company operating rules or specific instructions, the regulations of any federal or state regulatory agency, or any applicable traffic laws or ordinances (including speed limits) which contributed to an accident.

3.   The National Safety Council defines a preventable accident as:

    a.   *"A preventable collision is one in which the driver failed to do everything that reasonably could have been done to avoid it."*[22]

4.   FMCSR § 385.3 – Definitions

    a.   *"Preventable accident on the part of a motor carrier means an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver."*

5.   FMCSR, Appendix A to Part 385

    a.   *"Preventability will be determined according to the following standard: 'If a driver, who exercises normal judgment and foresight, could have foreseen the possibility of the accident that in fact occurred, and avoided it by taking steps within his/her control which would not have risked causing another kind of mishap, the accident was preventable'."*

---

[22] National Safety Council's Guide to Determine Motor Vehicle Collision Preventability, page 2.

## VII.    CONCLUSIONS.

From the information provided to me, and the opinions reached in this report. I conclude the following:

1.  Defendant Ferrell was required to have the necessary knowledge, skills, and safe driving attitude to prevent having others crash into him but failed to apply such knowledge, skill, and attitude as indicated in this report.

2.  Defendant Ferrell had a responsibility to apply defensive driving concepts like The Smith System but failed to do so.

3.  Defendant Ferrell knowingly became a rolling roadblock for approaching motorists.

4.  Defendant Ferrell intentionally utilized the public highway as his bathroom, despite having reasonable options available to him.

5.   Silacal is responsible for the actions of Defendant Ferrell as it relates to the safe operation of a CMV.

6.  Silacal is responsible to train and supervise their professional drivers; namely Defendant Ferrell.

7.  According to industry standards, this collision was preventable on the part of Silacal and Defendant Ferrell.

***These are the opinions I have as of this date, and I reserve the right to supplement my opinions as new or additional information becomes available to me. These opinions are not intended to be considered legal conclusions. Rather, these opinions, and the methods for reaching them, are consistent with the methods and process by which a truck safety professional such as myself would ordinarily use in conducting an accident investigation and crash preventability determination during the normal scope of business as a motor carrier. These opinions are based on the facts and materials provided to me in this case as identified in Appendix B to this report, as well as the totality of my experience, education, and training; and specifically includes reliance on various peer reviewed sources as referenced in footnotes throughout this report, in conjunction with industry customs and standards as practiced in the trucking industry.***

I, ADAM GRILL, CERTIFY THAT THESE ARE MY OPINIONS ON THIS 26TH DAY OF APRIL, 2024 REGARDING THE CASE OF LATELY, ET AL. VS SILACAL, ET AL.

_____
ADAM GRILL

## REVIEW OF MATERIALS AND INFORMATION BY ADAM GRILL

*Regarding Lately v Silical*

1. ACE Crash List
2. ACE Equip list
3. Carrier Profile
4. Corresp
5. Final res
6. FMCSA
7. Inspection Report
8. New Entrant
9. No Contact
10. offsite
11. Crash Report
12. DSC_0008-DSC_0032
13. Safety Measurement System
14. Discovery Docs from Silical, Inc.
15. Deposition Transcript of Krzysztof Karleszko Vol 1
16. Deposition Transcript of Krzysztof Karleszko Vol 2
17. Deposition Summary of Krzysztof Karleszko Part 1
18. Deposition Summary of Krzysztof Karleszko Part 2

# ADAM GRILL, C.D.S.

Atlantic Pacific Resource Group · 1236 Cordova Street, Billings, MT 59101
**Adam@LewGrill.com · 406.248.2766**

## PROFESSIONAL BACKGROUND

Raised in a family environment that centered on truck driving and truck driver training, I have worked around large commercial vehicles and studied the intricacies of commercial vehicle transportation among the best in the industry. I received my certification as a commercial vehicle operator in 2005. I hold a CDL with endorsements for hazardous materials, tankers, double trailers, triple trailers, passenger buses, and school buses. I am a certified director of safety (CDS). I am certified for forklift operation, operation of longer combination vehicles (LCVs), crane hoist and rigging, aerial manlift, telehandler, and heavy equipment including payloaders and motor graders. I am a certified pilot car operator and flagger through Gulf Coast Community College in Panama City, Florida.

For eight years I served in the US Army and US Army National Guard where I was called upon to teach truck and heavy vehicle operation and driver safety, among other duties. I am currently an active truck driver, and an associate of Atlantic Pacific Resource Group. I have formal truck driver training and education from Sage Technical Services, MTS Freight, the United States Army, the Montana Army National Guard, The National Safety Council, the Smith System Driver Improvement Institute, and others.

My family experience and lifestyle have always centered on the instruction and operation of heavy equipment and tractor-trailers. I currently serve as a trucking consultant and manage the fleet for Lew Grill Specialized Services. I have also assisted in over a dozen special studies and trucking projects covering safety procedures as well as time and motion studies including visibility from CMV drivers' point-of-view, starting/stopping, turning, and various other aspects of safe and efficient trucking operation. I have worked in various capacities as a teacher, including classroom instructor, off-road driving range instructor, and on-road skills instructor.

I have over 15 years of combined experience as a truck driver, forklift operator, heavy equipment operator, industrial machinery operator, truck-driving instructor, dock supervisor, truck-driving consultant, yard hostler, and accident investigator. I am a member of the Transportation Research Board of the National Academies, Owner-Operator Independent Drivers Association, Truckload Carrier's Association, Montana Contractor's Association, National Private Truck Council, Montana Motor Carrier's Association, and the American Trucking Association. I have participated in educational training at the American Trucking Associations Technology and Maintenance Council. I worked on a project for the Federal Motor Carrier Safety Administration relating to the testing protocol for Electronic Logging Devices (ELDs) as required under the proposed rulemaking.

My current focuses include training and supervision of truck drivers, training instructors, and warehousing staff, fleet management for Lew Grill Specialized Services and The Legacy International Corporation, freight hauling and truck/trailer transportation, truck and driver dispatching, special projects for various fleet, industry, and government entities, and the development of educational programs for commercial drivers, equipment operators, and industry professionals, as well as supervisor for the motor carrier and broker relationships involving Atlantic Pacific Resource Group and The Legacy International Corporation with outside brokers, shippers, motor carriers, and others.

I have experience in truck accident investigation, vehicle dynamics, and accident reconstruction from the Legacy Corporation. I have testified in litigation matters where I have qualified as an expert concerning safe operation of commercial motor vehicles and the standard of care of commercial vehicle operators and motor carriers. I have operated a commercial motor vehicle for the furtherance of interstate commerce in AL, AZ, AR, CA, CO, CT, DC, DE, FL, GA, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY.

## WORK EXPERIENCE

**2014 – CURRENT**
**WAREHOUSE MANAGER, SAFETY SUPERVISOR, TRAINING SUPERVISOR, FMCSA CONSULTANT,** THE LEGACY CORPORATION INTERNATIONAL

Create and maintain policies and programs for warehousing, industrial safety programs, CMV driver training school, CMV driver training curriculum development, CMV instructor hiring and management, and special projects for fleet, industry, and government.

**2003 – CURRENT**
**TRUCK DRIVER, FORKLIFT OPERATOR, DOCK SUPERVISOR, SAFETY DIRECTOR, CONSULTANT,** ATLANTIC PACIFIC RESOURCE GROUP/LEW GRILL SPECIALIZED SERVICES

Setup and management of broker operations and freight operations. Accident analysis and trucking litigation consulting, truck driving assignments, transportation studies, special projects, truck and trailer management, training program development and facilitation, various DOT projects for the Federal Motor Carrier Safety Administration. Assistance in various truck-driving investigations, time and motion studies, turning studies, visibility studies, and human factors tests.

**2010 – 2016**
**TRUCK DRIVER, FORKLIFT OPERATOR, DOCK SUPERVISOR,** MTS FREIGHT

Local and regional LTL operations using 4 to 8-axle tractor/trailer combinations including doubles/triples, straight trucks, lift gate operations, and daily yard hostler operations and responsibilities. Forklift and dock work including loading/unloading of trailers, freight staging, and warehousing. Dock operations management including truck driver dispatching, manifesting, warehousing oversight, customer relations, and forklift operator management.

**2008 – 2009**
**TRUCK DRIVER,** BRIGGS DISTRIBUTING

Local and regional truck driving and lift gate operations, customer relations including bill of lading management and cash/check/credit receivables.

**2008 – 2013**
**TRUCK DRIVER, TRUCK DRIVING INSTRUCTOR,** SAGE TECHNICAL SERVICES

Classroom, lab, range, and public road truck driving instruction on various tractor/trailer combinations.

**2007 – 2014**
**CHEMICAL SPECIALIST, TRUCK DRIVER/HEAVY VEHICLE OPERATOR,** UNITED STATES ARMY, UNITED STATES ARMY RESERVE, UNITED STATES ARMY NATIONAL GUARD - MONTANA

Various military duties including specialized hazardous materials and chemical training, equipment hauling, military/civilian driver relations, driver safety, truck-driving operation, close quarters backing/maneuvering.

**2006**

**TRUCK DRIVER,** GEO DISTRIBUTING

Local and regional truck driving operations. Customer relations including bill of lading management and cash/check/credit receivables.

# SPECIAL PROJECTS, RESEARCH, TRUCK DRIVING, AND INSTRUCTIONAL ASSIGNMENTS

**2021 - CURRENT**

**CDL TRAINING CURRICULUM,** LEGACY INTERNATIONAL

Development of online and classroom CDL training curriculum in accordance with FMCSR §380, Appendices A-F.

**2021 - CURRENT**

**TRANSPORTATION MOBILE APPLICATIONS,** LEGACY INTERNATIONAL

Development of transportation mobile applications for iOS and Android and distributed on the Apple Store and Google Play.

**2016 - CURRENT**

**ASSESSMENT OF SAFETY TECHNOLOGIES IN TRUCKING,** LEGACY INTERNATIONAL

ELD's, tire pressure monitoring (TPMS) and tire pressure balancing systems, fuel efficiency monitoring, remote truck and driver video monitoring, satellite-based tracking, mobile communications/telematics/dispatching, real-time performance alerts, lane departure warning, forward collision warning, pedestrian and bicycle path intrusion warning, GPS mapping, CMV-to-CMV communications.

**2021**

**VEHICLE CONTROL TEST,** SPECIAL PROJECT

Testing in conjunction with a CMV crash to demonstrate the timing and visibility factors for a CMV conducting a left turn.

**2019**

**VEHICLE CONTROL TEST,** SPECIAL PROJECT

Testing in conjunction with a CMV crash to demonstrate the capabilities and limitations of a combination commercial vehicle in navigating various hill grades safely without applying brakes.

**2018**

**MIRROR ADJUSTMENT AND BLIND SPOT STUDY,** SPECIAL PROJECT

Testing to determine the visibility limitations of various mirror sets, including the identification of blind spots through properly adjusted convex mirrors, west coast mirrors, and fender mirrors.

**2018**

## BACKING TEST, SPECIAL PROJECT

Testing to determine safe and efficient backing speeds, as well as space limitations to perform 90-degree back maneuvers.

**2018**

## STOPPING DISTANCE TEST, SPECIAL PROJECT

Stopping tests of various empty and fully loaded tractor-trailer combinations within measured distances at various speeds for the purposes of assessing efficacy of braking components, including ABS.

**2018**

## VEHICLE CONTROL AND DRIVER PERCEPTION, SPECIAL PROJECT

Testing in conjunction with a CMV crash to demonstrate the timing and limitations of a combination commercial vehicle as it relates to 90-degree backing into a driveway. Evaluated the time and space requirements necessary to safely and reasonably complete such maneuvers.

**2014 - 2017**

## ELD PROTOCOL TESTING, FMCSA SPECIAL PROJECT

Assisted on USDOT project relating to ELD required testing protocol and procedures to meet the federal rule for Electronic Log Device testing. Providing subject matter expertise on the user experience of working with ELD's, assisting with the information gathered for FMCSA, and providing trucks and driver services for use as a real-time test.

**2017**

## STOPPING DISTANCE STUDY, SPECIAL PROJECT

Stopping tests of various empty and fully loaded tractor-trailer combinations within measured distances at various speeds for the purposes of assessing efficacy of braking components, including ABS.

**2016**

## TIME AND MOTION STUDY, SPECIAL PROJECT

Time and distance testing for left and right lane change maneuvers with a tractor and 53-foot semi-trailer.

**2015**

## TIME AND MOTION STUDY, SPECIAL PROJECT

Time testing for various left-turn, right-turn, and lane change maneuvers with a 48-foot and 28-foot set of doubles.

**2014**

## VISIBILITY STUDY, SPECIAL PROJECT

Study testing various forward and lateral visibility factors from the driver seat of a tractor.

**2013**

**TRUCK DRIVING INVESTIGATION,** SPECIAL PROJECT

Investigation measuring U-turn distances and space requirements for a 5- axle tractor/53-foot trailer combination.

**2013**

**TRUCK DRIVING INVESTIGATION,** SPECIAL PROJECT

Driving to and from Houston, Texas for the purpose of recreating possible driving routes in conjunction with an accident investigation.

**2011**

**TRUCK DRIVING INVESTIGATION,** SPECIAL PROJECT

Nighttime visibility study on I-40 west of Kingman, Arizona.

**2010**

**TRUCK DRIVING INVESTIGATION,** SPECIAL PROJECT

Drove a 5-axle tractor/53-foot trailer combination to, from, and during an investigation of right-turn visibility factors. Filmed truck drivers, mirrors, and streets for the purposes of measuring and studying right-turn visibility.

**2008**

**VELOCITY INVESTIGATION,** SPECIAL PROJECT

Investigation of velocity ranges of commercial vehicles as a function of gear selection at low engine speed versus top governed speed.

**2008**

**TIME AND MOTION STUDY,** SPECIAL PROJECT

Study and reconstruction of CMV movements using low gears from a stopped position.

**2007**

**STOPPING DISTANCE INVESTIGATION,** SPECIAL PROJECT

Stopping tests of a fully loaded tractor-trailer within measured distances at various speeds.

**2005**

**TIME AND MOTION STUDY,** SPECIAL PROJECT

Right-turn study of 5-axle tractor-trailer.

**2005**

**VISIBILITY STUDY,** SPECIAL PROJECT

Visibility measurement study regarding mirror use of tractor-trailer.

**2004**

**TIME AND SPEED STUDY,** SPECIAL PROJECT

Study of various complex truck transmissions in all gears.

**2004**
**TIME AND MOTION STUDY,** SPECIAL PROJECT
Right-turn study testing the recognition and feel of tractor-trailer off tracking.

**2003**
**VISIBILITY STUDY,** SPECIAL PROJECT
Visibility study of truck/tractor right side port window.

**2002**
**LOAD STUDY,** SPECIAL PROJECT
Study on various loading techniques and load shifting patterns.

**2001**
**VISIBILITY STUDY,** SPECIAL PROJECT
Study testing driver visibility at acute angle intersections and special scenarios such as railroad crossings and freight/yard entrances and exits.

# SPEAKING ENGAGEMENTS AND PRESENTATIONS

**2022**
**GUEST CONTRIBUTOR,** AFTER THE CRASH TRUCKING PODCAST
Guest speaker and contributor discussing truck driver training, truck crash trends, and other trucking industry issues.

**2022**
**GUEST CONTRIBUTOR,** SIRIUSXM'S WOMEN IN TRUCKING SHOW
Guest speaker and contributor discussing trends in the trucking industry, training, and the advancement of industry education outside of the industry.

**2022**
**SPEECH AND PRESENTATION ON PRESERVING TRUCK TECHNOLOGY,** NORTH CAROLINA ASSOCIATION FOR JUSTICE
Speaker and presenter on types and sources of truck technology, and the use and preservation of data from such technology.

**2022**
**SPEECH AND PRESENTATION ON TRAINING,** FLORIDA JUSTICE ASSOCIATION
Speaker and presenter on issues involving safety management controls and motor carrier/driver safety training requirements and standards.

**2022**

### SPEECH AND PRESENTATION ON LEP AND CMV PARKING, 360 ADVOCACY GROUP

Speaker and presenter on issues involving limited English proficiency, the history of LEP regulatory standards, trip planning and CMV parking issues, as well as determining crash preventability based on previous driving history.

**2022**

### SPEECH AND PRESENTATION ON CMV PARKING, FRIED GOLDBERG TRUCKING SYMPOSIUM

Speaker and presenter on issues involving trip planning and CMV parking issues.

**2019**

### SPEECH AND PRESENTATION ON RECOGNIZING PARTIES AND ROLES, FJA WORKHORSE SEMINAR

Speaker and presenter on broker liability, truck crash parties and their relationships, understanding motor carrier documents and their importance
to truck crashes, and key issues in truck accidents. Florida Justice Association, Orlando, Florida.

**2018**

### SPEECH AND PRESENTATION ON BROKER LIABILITY, 360 ADVOCACY GROUP

Presentation on broker liability and understanding the broker/carrier process from procurement to payment. 360 Advocacy Group, Las Vegas, Nevada.

**2018**

### SPEECH AND PRESENTATION ON BROKER LIABILITY, PRIMERUS DEFENSE INSTITUTE

Presentation on broker liability and understanding the broker/carrier process from procurement to payment. Primerus Defense Institute, Las Vegas, Nevada.

**2017**

### SPEECH AND PRESENTATION ON ACCIDENT PREVENTABILITY AND FAULT ANALYSIS, WHITEWOOD TRANSPORTATION

Whitewood Transportation Annual Convention, "Accident Preventability, Fault & Negligence", Billings, Montana. Presented on fault analysis and techniques for recognizing and determining preventability.

**2016**

### SPEECH AND PRESENTATION ON ACCIDENT SCENE BREAKDOWN

Speech on accident scene breakdown, standard procedures, hazards, and effective practices conducted for insurance agencies, motor carriers, and drivers.

## AUTHORED PUBLICATIONS

**2021**

**TRUCKING STANDARDS MOBILE APPLICATION,** LEGACY INTERNATIONAL

Developed by The Legacy Corporation, International and presented on the Apple Store and Google Play, featuring: Federal Motor Carrier Safety Regulations with interpretations, summaries, and commentaries; OSHA trucking standards; MAP-21 Act; CDL Standards; FAQ's; and CMV records and investigations.

## LICENSING, CERTIFICATIONS, AND CONTINUING EDUCATION

**2005 - CURRENT**
Commercial Driver License with endorsements for hazardous materials, tankers, double trailers, triple trailers, passenger buses, and school buses.

**2023**
GeoTab Connect global educational conference. Orlando, Florida.

**2022**
Crash Investigation 1, Northwestern University Center for Public Safety.

**2021**
Bachelor of Science, Business and Communication – Montana State University.

**2020**
Certified Director of Safety, North American Transportation Management Institute.

**2020**
North American Transportation Management Institute's (NATMI) training program for Certified Safety Supervisor.

**2020**
NATMI training program for Certified Director of Safety

**2020**
National Safety Council's Defensive Driving Safety Training for Professional Truck and Van Drivers.

**2019**
Licensed Trusted Agent – Transportation Security Administration

**2019**
Certified First Observer – Transportation Security Administration: Certificates for highway worker, truck rental, general trucking, over-the- road bus, school bus, and general parking.

**2019**
Trimble ELD and Fleet Manager Workshop and training course, Minnetonka, Minnesota.

**2017**
Skid Pad Training and Defensive Driving Assessment, Acton, Montana.

**2017**
Telehandler Certification Course, Billings, Montana.

**2017**
Aerial Man Lift Certification Course, Billings, Montana.

**2017**
Forklift Certification Course, Billings, Montana.

**2016**
Crane Hoist and Rigging Certification Course.

**2016**
Transportation Worker Identification Credential (TWIC): Security clearance certification by the U.S. Department of Homeland Security for unescorted access to secure areas of facilities and vessels regulated under the Maritime Transportation Security Act (MTSA).

**2016**
Truck and Bus Safety Subcommittee Meeting, Transportation Research Board of the National Academies (TRB), Washington D.C.

**2015**
Technology and Maintenance Council research and forum education.

**2015**
Pilot/Escort Driver & Flagging Certification for Oversize and Super Loads of extreme weight & dimension, Gulf Coast College, Panama City, Florida.

**2015**
Forklift safety certification and training, MTS Freight.

**2015**
Truck and Bus Safety Subcommittee Meeting, Transportation Research Board of the National Academies (TRB), Washington D.C.

**2014**
Distracted Driving certificate of training, Smith System Driver Improvement Institute.

**2014**
Truck Forward Motion certificate of training, Smith System Driver Improvement Institute.

**2014**

USDOT/Federal Motor Carrier Safety Administration safety audit on Atlantic Pacific Resource Group d/b/a Lew Grill Specialized Services.

**2015**
Forklift safety certification and training, MTS Freight.

**2011**
Heavy equipment operation certification and training.

**2010**
LCV training, MTS Freight.

**2009**
LCV Certification, Sage Technical Services.

**2008**
Certified Driving Instructor, Sage Technical Services.

**2007**
US Army Heavy Vehicle Operator's License.

**2005**
Tractor-Trailer Driver TTD 150 certificate of training, Sage Technical Services.

**2005**
Certificate of Attainment, PTDI.

**2005**
Safety Management Council certificate of driver/dispatch relations, Sage Technical Services.

## MEMBERSHIPS

- Transportation Research Board of the National Academies (affiliate member)
- The Royal Society for the Prevention of Accidents
- North American Transportation Management Institute
- National Private Truck Council
- Montana Motor Carriers Association
- American Trucking Association
- Truckload Carrier's Association
- Montana Contractor's Association
- National Safety Council
- Owner-Operators Independent Driver Association

## EXPERT WITNESS TESTIMONY BY TRIAL OR DEPOSITION – PREVIOUS FOUR YEARS

| DATE | CAPTION | STATE | CASE NO. |
|------|---------|-------|----------|
| 04/09/2019 | Murray vs A&B Hardwood Flooring, et al. | IL | 16 L 7570 |
| 05/16/2019 | Burciaga vs Hightower | NV | A-16-734774-C |
| 06/27/2019 | Powers vs Central Transport | OK | CJ-2017-03532 |
| 2/17/2020 | Edmonds vs Model Transport, et al. | TN | 1:18-cv-01222-STA-jay |
| 3/16/2020 | Thorbus vs H.H. Williams | WY | 19-CV-106-S |
| 4/24/2020 | Hall vs Ferguson, et al. | FL | 2018-CA-000664-A |
| 5/18/2020 | Ryba vs Stavens, et al. | CT | TTD-CV-19-6017162-S |
| 5/29/2020 | Patrick vs Cemex, et al. | FL | 50-2017-CA-007007-XXXX-MB |
| 7/24/2020 | Domingue vs Dis-Tran Steel, et al. | LA | 2563-F |
| 8/5/2020 | Randolph vs Greenwood Motor Lines, et al. | FL | 2018-CA-6245 |
| 10/8/2020 | Yanez vs Knight, et al. | TX | 2019-CVA-000440-D1 |
| 11/19/2020 | Hall vs Ferguson, et al. | FL | 2018-CA-000664-A |
| 12/16/2020 | Spilman vs Clark | IL | 16-L-000337 |
| 12/21/2020 | Brown vs W.O. Seale | MO | 3:19-cv-05098 |
| 3/10/2021 | Popovski vs Titan Transfer | WY | 20-cv-27 SWS |
| 3/26/2021 | Lopano vs New Line Transport | FL | 2017-95-CA |
| 4/22/2021 | Melendez vs South Texas Oilfield Solutions, et al. | TX | 17-066-57300-CV |
| 4/26/2021 | Workman vs KTL Trucking | WV | 20-CV-00059 |
| 4/30/2021 | Flores vs Granite Rock Company | CA | 18CV333504 |
| 5/17/2021 | Cowden vs Restaurant Technologies | FL | 19-CA-500 |
| 5/20/2021 | Alvarez vs Halliburton, et al. | TX | 2019-25663 |
| 6/1/2021 | Bissell vs Kelley, et al. | MO | 20BT-CV00947 |
| 6/4/2021 | Newmarch vs Uribe, et al. | WA | 17-2-02501-34 |
| 7/1/2021 | Rojo vs AFT | NM | D-101-CV-2019-00855 |
| 7/16/2021 | Urie vs Trans Sohol Logistics, et al. | MO | 3:19-CV-03401-MDH |
| 8/2/2021 | Morales vs Genesis, et al. | TX | 2018CI19254 |
| 8/6/2021 | Baggiani vs Auto Owners, et al. | WI | 18-CV-125 |
| 8/13/2021 | Lovato vs Case and Bustos | WY | 193-040 |
| 8/19/2021 | Reyes vs DKG | AR | 2:20-CV-02118-PKH |
| 8/27/2021 | Hernandez vs Desperado Services | TX | CV55975 |
| 9/10/2021 | Estate of Rivera, et al. vs Werner, et al. | TX | DC-18-17194 |
| 9/30/2021 | Linnik vs Trans Quality, et al. | WY | 20-CV-89-F |
| 10/14/2021 | Hall vs Ferguson Enterprises, et al. | FL | 2018-CA-000664-A |
| 10/27/2021 | Gruber vs Ranger Energy Services | CO | 2020CV30841 |
| 11/5/2021 | Garza vs Mencar, et al. | TX | 2020-DCL-03395 |
| 12/10/2021 | Widdows vs Trucks, Inc., et al. | FL | 3:20-CV-00799-BJD-PDB |
| 12/14/2021 | Adame vs JW Parker, et al. | TX | 201989362 |
| 12/20/2021 | Murphy vs Holman Transportation | CO | 21-cv-00585-KLM |
| 01/06/2022 | Douglas vs RJ Transportation, et al. | TX | 2018-57881 |
| 01/14/2022 | Santiago vs Pilot Travel Centers | NM | D-117-CV-2020-00264 |
| 03/07/2022 | Webb vs Big Time Trucking | TX | 2020-19402 |
| 03/10/2022 | Hughes vs Ring Power Corporation | FL | 19-CA-1741 |
| 04/01/2022 | Cannata vs Disney World, et al. | FL | 17-CA-006575 |
| 04/08/2022 | Hinkson vs Underground Vaults, et al. | KS | GE-2020-CV-000165 |
| 04/11/2022 | Failla vs George's Food, et al. | NJ | 3:20-cv-07109-BRM-TJB |

| Date | Case | State | Case Number |
|---|---|---|---|
| 04/15/2022 | Bough vs J Squared, et al. | CA | BCV-20-101708-BCB |
| 04/19/2022 | Duncan vs Gary Dirt, et al. | KY | 20-CI-321 |
| 04/22/2022 | Ramirez vs FedEx | TX | 2019-74906 |
| 05/02/2022 | Zavala vs Cowtown Moving, et al. | TX | 236-316344-20 |
| 05/18/2022 | Wood vs Benjamin Steel, et al. | OH | 20CV0359 |
| 06/03/2022 | Craig Kennedy vs Rush Truck Leasing, et al. | FL | 2019-CA-012978-O |
| 07/01/2022 | Maravilla vs Best Bay Trucking, et al. | CA | RG20061033 |
| 07/08/2022 | Tierra Carter vs Alliance Trucking, et al. | TX | A190316-C |
| 07/15/2022 | Ocana vs Construction Ortega, et al. | CA | CIVDS1724892 |
| 08/09/2022 | Boyd vs Quick Construction, et al. | OK | CJ-2020-30 |
| 08/12/2022 | Espinoza vs Justin Langley Trucking, et al. | TX | 7:21-cv-416 |
| 09/06/2022 | D'Anza vs New Bern Transport | FL | 19-CA-002156 |
| 09/09/2022 | King vs BVR, et al. | TX | 20-06-23597-CVR |
| 09/12/2022 | Jenkins vs Office Depot | NV | A-20-823171-C |
| 09/23/2022 | Lee vs Perdue Foods | NC | 20-CVS-183 |
| 09/27/2022 | Hepburn vs Horizon Midwest | GA | 1:21-cv-02202-JPB |
| 10/03/2022 | Dominguez vs Gem Mobile Treatment, et al. | TX | 2021CCV-60399-1 |
| 10/28/2022 | Green vs Amazon, et al. | IL | 18 L 10599 / 18 L 11677 |
| 11/01/2022 | Dominguez vs Gem Mobile Treatment, et al. | TX | 2021CCV-60399-1 |
| 11/03/2022 | Guerrero vs Mobile Mini, et al. | TX | 2021 DCV 2748 |
| 11/22/2022 | Bough vs J Squared, et al. | CA | BCV-20-101708-BCB |
| 12/22/2022 | Kreps vs Dependable Sanitation, et al. | SD | 4:21-CV-04108 |
| 01/06/2023 | Price vs US Autologistics | TX | 2021-62660 |
| 01/17/2023 | Carrion vs Home Depot | FL | 2016-000534-CA-01 |
| 01/23/2023 | Fair vs JLR Trucking, et al. | FL | 2021-CA-008574-O |
| 01/30/2023 | Villarreal vs Jones Transportation, et al. | TX | 1:21-CV-00503 |
| 02/13/2023 | Wilson vs Raven Transport, et al. | FL | 2018-CA-000299 |
| 02/17/2023 | Barber vs Wiggins Hauling, et al. | FL | 21-CA-4565 |
| 02/20/2023 | Perez vs Around The Clark Trucking, et al. | MD | CAL21-11082 |
| 02/23/2023 | Butler vs CTS National, et al. | GA | 5:21-cv-00182-TES |
| 04/14/2023 | Dickerson vs Grammar Logistics, et al. | TX | 21-DCV-286389 |
| 05/12/2023 | Vaughan vs JB Hunt, et al. | OR | 3:21-cv-00589-JR |